**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COLLEEN DWYER** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 19-4751** |
| | : | |
| **UNUM LIFE INSURANCE** | : | |
| **COMPANY OF AMERICA** | : | |

**McHugh, J.**                                                                      **July 8, 2021**

<u>**MEMORANDUM**</u>

### I.      Introduction

This is an appeal of Defendant Unum's denial of Plaintiff Colleen Dwyer's claim for long

term disability benefits arising under ERISA, 29 U.S.C. § 1132(a).  In 1998, Ms. Dwyer suffered

a double amputation below the knee.  She had previously been diagnosed with Meniere's disease,

which periodically gives her extreme nausea and vertigo, among other symptoms.  Despite these

challenges, she functioned well for many years.  In 2018, however, her Meniere's worsened, and

her physician and psychologist concluded she was unable to meet the demanding requirements of

her job as a project manager.  Defendant approved Plaintiff's claim for short-term disability

benefits for six months.  Then, when Plaintiff applied for long-term disability benefits, Defendant

denied this claim, contending that in fact she had not been disabled even during part of the time

that she was receiving short-term disability benefits.  This appeal followed, and the parties have

stipulated to a resolution based upon cross-motions for Judgment on Partial Findings pursuant to

Federal Rule of Civil Procedure 52

The standard of review is *de novo*.  For the reasons below, I conclude that Plaintiff has

shown beyond a preponderance of the evidence that she is disabled under the terms of the benefits

plan, because she has suffered a worsening of her condition that significantly affects her ability to function. She is therefore entitled to retroactive reinstatement of the long-term benefits.

## II. Standard of Review[1]

"[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, the parties have agreed that *de novo* review is appropriate. *See Dwyer v. Unum Life Ins. Co.*, 470 F. Supp. 3d 434, 437 (E.D. Pa. 2020).

Under a *de novo* review, "[t]he administrator's decision is accorded no deference or presumption of correctness." *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413-14 (3d Cir. 2011) (quoting *Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002)). Rather, "[t]he court must review the record and determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Id.* at 414 (quoting *Hoover*, 290 F.3d at 809). I may base this determination on "any information before the administrator initially as well as any supplemental evidence." *Id.* at 418 (cleaned up); *see also Luby v. Teamsters Health, Welfare, and Pension Trust Funds*, 944 F.2d 1176, 1184–85 (3d Cir. 1991) ("[A] district court exercising *de novo* review over an ERISA determination between beneficiary claimants is not limited to the evidence before the Fund's administrator.").[2]

---

[1] I exercise jurisdiction pursuant to 29 U.S.C. § 1132(a).

[2] Here, both parties to some degree have referred to materials outside the administrative record, and I have exercised my discretion to give these documents due consideration. The administrative record was closed almost two years ago, when Plaintiff's administrative appeal was denied. Having access to these additional evidence aided in my resolution of this case.

Plaintiff bears the burden of proof, and she must demonstrate she is disabled by a preponderance of the evidence. *See Pesacov v. Unum Life Ins. Co. of Am.*, 463 F. Supp. 3d 571, 577 (E.D. Pa. 2020) (citations omitted).

"In determining whether a claimant is entitled to benefits under an ERISA plan, one 'begins with the language of the plan defining disability,' and then considers whether the claimant's diagnoses render her disabled under the plan." *Id.* (quoting *Vastag v. Prudential Ins. Co. of Am.*, No. 15-6197, 2018 WL 2455921, at *9-10 (D.N.J. May 31, 2018)).

Here, my review is augmented by specific provisions that Unum agreed to incorporate into its handling of claims pursuant to a settlement it reached following litigation with several public authorities. Specifically, in 2004, Defendant Unum entered into a Regulatory Settlement Agreement ("RSA") with the United States Department of Labor and insurance commissioners of various states, including Pennsylvania. *See* Reg. Settlement Agreement, Pl. Mot. Judg. Ex. B, ECF 32-5. Defendant agrees that the RSA governs Plaintiff's claims under the Plan. *See* Def. Resp. to Interrogatories, Pl. Mot. Judgment Ex. D at 19, ECF 32-7 ("Unum Life incorporated changes to its claims handling procedures pursuant to the RSA in 2008, and those changes are reflected in the claims manual produced to Plaintiff during the claim . . . there were no actions taken in the handling of Plaintiff's claim which were contrary to the provisions of the RSA, which is a living agreement and still in effect.").

Pursuant to this Agreement, the "Company's claim procedures shall include" several "ongoing objectives." Reg. Settlement Agr. at 16. As relevant here, those objectives include:

> Giving significant weight to an attending physician's ("AP") opinion, if the AP is properly licensed and the claimed medical condition falls within the AP's customary area of practice, unless the AP's opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record. In order for an AP's opinion to be

rejected, the claim file must include specific reasons why the opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record.

*Id.* at 70-71.  In addition, Defendant must give significant weight to an employee's award of Social Security Disability benefits.  Defendant must:

[G]ive significant weight to evidence of an award of Social Security disability benefits as supporting a finding of disability, unless the Companies have compelling evidence that the decision of the Social Security Administration was (i) founded on an error of law or an abuse of discretion, (ii) inconsistent with the applicable medical evidence, or (iii) inconsistent with the definition of disability contained in the applicable insurance policy.

*Id.* at 13.  Finally, the RSA dictates how Defendant must handle claims involving multiple conditions:

When multiple conditions . . . are present, Company personnel will ensure that all diagnoses and impairments are considered and afforded appropriate weight in developing a coherent view of the claimant's medical condition, capacity and restrictions/ limitations.

*Id.* at 18.

## III.    Findings of Fact

In rendering a Judgment on Partial Findings, I am required to "find the facts specially."  Fed. R. Civ. P. 52(a)(1).  Both parties submitted proposed findings of fact, and Defendant submitted a voluminous Administrative Record (AR).  *See* ECF 30.[3]

### A.  Plaintiff's Medical and Vocational History

Plaintiff Colleen Dwyer is fifty-six years old.  *See* Claim Profile, AR-0004.  In 1998, Plaintiff suffered from toxic shock syndrome which necessitated surgical amputation of both of

---

[3] When citing the record I will use the citations used by the parties, AR-[page number], which are docketed, under seal, at ECF 30 Exhibits 1 through 6.

her legs below the knees.  *See* Doctor's Notes (5/7/18), AR-1790; Compl. ¶ 30 (ECF 1); Answer ¶ 30 (ECF 8).  Plaintiff uses bilateral leg prostheses.  *See* Pl. Decl, AR-2390.

In 1993, Plaintiff was diagnosed with Meniere's disease.  *See* Notes Pl. call with Unum Rep (2/12/18), AR-1531.  Meniere's disease "is a disorder of the inner ear that causes severe dizziness (vertigo), ringing in the ear (tinnitus), hearing loss, and a feeling of fullness or congestion in the ear."  *Meniere's Disease*, NATIONAL INSTITUTES OF HEALTH, AR-2148.  "Attacks of dizziness may come on suddenly or after a short period of tinnitus or muffled hearing. Some people will have single attacks of dizziness separated by long periods of time. Others may experience many attacks closer together over a number of days. Some people with Meniere's disease have vertigo so extreme that they lose their balance and fall."  *Id.*  There is no cure for the disease, but treatments include medication, salt-restrictive diets, and cognitive therapy to reduce anxiety and help cope with the unexpected nature of attacks.  *Id.* at AR-2150.  Treatment can also include antibiotic or steroid injections into the middle ear to control hearing loss.  *Id.*

From 1993 until 2017, Plaintiff experienced infrequent Meniere's symptoms and could usually control these symptoms with Meclizine.  *See* Notes Pl. Call, AR-1531*;* Notes Pl. call with Unum (7/13/18), AR-1760.  During this time, Plaintiff functioned well and held various professional roles at companies around Pennsylvania.  *See* Pl. Curriculum Vitae, AR-1455 to AR-1457.

## B. Defendant and the Relevant Plan

Plaintiff was hired by P.H. Glatfelter Company ("Glatfelter") in September 2016 as a Project and Portfolio Management ("PPM") Process Lead. *See* Pl. Claim Profile with Unum, AR-1108; Pl. Curriculum Vitae, AR-1455.[4]

Plaintiff participated in the Glatfelter Health and Welfare Benefits Plan ("the Plan"), which is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). Defendant Unum Insurance Company ("Unum") is subject to ERISA as a Plan fiduciary because it exercises control over Plan assets. 29 U.S.C. § 1104; 29 U.S.C. § 1002(21)(A).

The Plan provides both short-term and long-term disability benefits. *See* Summary Plan Description for the Glatfelter Health and Welfare Benefits Plan ("Plan Summary"), AR-865. Glatfelter self-funds the Plan's short-term disability program, although Unum administers, processes, and initially adjudicates claims under that program. *See id.* at AR-865; *see also* Unum Admin. Services Agreement, Pl. Mot. Judgment Ex. A at 2, ECF 32-4. Unum fully insures the Plan's long-term disability ("LTD") program and administers, adjudicates, and pays claims for LTD benefits under the Plan. *Id.*; *see also* Stipulation (ECF 6).

## C. Plaintiff's Recent Meniere's Disease and Application for Benefits: February through April 2018

Plaintiff's Meniere's symptoms worsened in late 2017 and included vertigo, dizziness and vomiting. *See* Notes Pl. call with Unum Rep (2/12/18), AR-1531. She saw her primary care

---

[4] Glatfelter was originally included as a defendant in this case, but the parties stipulated that it should be dismissed, as "Unum was the sole decision-maker in deciding Plaintiff's claim for benefits and would be financially responsible for any long term disability benefits or other relief the Court may award." Joint Stipulation (ECF 6). Glatfelter was dismissed without prejudice on December 6, 2019. *See* Order (ECF 10).

provider, Dr. David Wilson, on January 15, 2018 due to "her Meniere's disease . . . flaring significantly." Dr. Wilson Encounter Notes (1/15/18), AR-762. Dr. Wilson observed that Plaintiff showed "nystagmus[5] on lateral eye motion bilaterally . . . [H]er symptoms are in both eyes." *Id.* at AR-764 to 765.

In early February 2018, Dr. Wilson recommended that Plaintiff stop working due to the severity of the condition. *See* Notes Pl. call (2/12/18), AR-1531. He anticipated that her symptoms would improve, and she could return to work in approximately one month. *See* Short-term disability ("STD") Claim Form, AR-50. Plaintiff worked her last day at Glatfelter on February 5, 2018. *See* Claim Profile, AR-1108. She did not return to work after that date. *Id.*

Dr. Wilson referred Plaintiff to see a specialist at York ENT Associates, Dr. Garth Good. *See* Patient Visit Notes, AR-725 to AR-727. Plaintiff first saw Dr. Good on February 20, 2018. *Id.* Dr. Good wrote that Plaintiff reported that over the past month, her Meniere's episodes occurred four to five times per week, lasted several hours, and were "at times associated with nausea and vomiting." *Id.* at AR-725. He recorded that she "has noticed increased tinnitus in the left ear over the last several months" and that Plaintiff's hearing "has gradually worsened over the years in the left ear." *Id.* Dr. Good requested an audiogram which showed "sensorineural hearing loss ranging from moderately severe and rising to moderate" in the left ear. *Id.* at AR-726. He diagnosed Plaintiff with Meniere's disease in the left ear and with sensorineural hearing loss in the left ear. *Id.* Dr. Good recommended that Plaintiff continue with her prescribed medication, Hydrochlorothiazide. *Id.* He also placed Plaintiff on a ten-day prednisone taper. *Id.*

---

[5] Nystagmus is "an involuntary rhythmic side-to-side, up and down or circular motion of the eyes." *Nystagmus*, JOHNS HOPKINS MEDICINE, CONDITIONS AND DISEASES, https://www.hopkinsmedicine.org/health/conditions-and-diseases/nystagmus (last visited July 2, 2021). "When nystagmus is related to a problem involving the vestibular system in the inner ear or the brain, vertigo, dizziness or loss of balance are almost always present." *Id.*

Plaintiff saw Dr. Good again on March 6, 2018. *See* Patient Visit Notes, AR-721. Dr. Good recorded that Plaintiff's "typical episodes last several hours and are associated with nausea and at times vomiting" and that "between episodes she is asymptomatic." *Id.* He observed that Plaintiff "has not obtained any benefit from oral prednisone therapy" and recommended that she "continue to adhere to a Meniere's diet as well as use 'hydrochlorothiazide daily.'" *Id.* He noted that Plaintiff would be tapering off prednisone. *Id.* Finally, Dr. Good referred Plaintiff to a consultant with additional expertise in Meniere's disease, Dr. Isaacson, "for discussion of further, more invasive treatment options." *Id.*

Plaintiff also underwent a Videonystagmography (VNG) study at Associated Otolaryngologists of Pennsylvania on April 24, 2018. *See* VNG Report, AR-733. VNG "measures the movements of the eyes directly through infrared cameras." *Videonystagmography*, NATIONAL DIZZY AND BALANCE CENTER, AR-2180. She obtained the results several weeks later in an appointment with Dr. Isaacson (discussed below).

**D. Psychological Treatment**

Throughout this time period, Plaintiff also sought psychological treatment. Plaintiff had seen a psychologist, Dr. Elizabeth Revell, Ph.D., beginning in 2014 and had received treatment on-and-off for several years. *See* Mental Health Assessment Form, AR-2154. Plaintiff began seeing Dr. Revell again in March 2018. *Id.* Plaintiff had reached out sooner but Dr. Revell was on sick leave. *Id.*

Dr. Revell diagnosed Plaintiff with chronic post-traumatic stress disorder connected to her amputations and repeated falls, recurrent severe major depressive disorder without psychosis, agoraphobia with panic disorder, mood disorder due to known physiological condition with depression, and anxiety disorder due to known physiological condition. *See* Patient Information,

AR-748.  Plaintiff saw Dr. Revell weekly through August 2018 and then began seeing her every two weeks.  *See* Session Notes, AR-749 to AR-750.

In Dr. Revell's opinion, Plaintiff's physical and psychological symptoms were connected. She later wrote to Unum that Plaintiff "suffers from psychiatric symptoms which are related to and triggered by her physical symptoms."  Letter from Dr. Revell to Unum (10/16/18), AR-753. Multiple session notes from Dr. Revell show that Plaintiff discussed her Meniere's symptoms and how she felt about them.  *See* Session Notes, AR-749 to AR-750.  In particular, Dr. Revell noted that the vertigo, dizziness, and falls caused by Meniere's disease were psychologically triggering to Plaintiff due to her amputee status.  *See* Letter from Dr. Revell to Unum April 2018, AR-1286; *see also* Encounter Notes from Dr. Wilson May 3, 2018 (stating that he reviewed "recent note from the psychologist" and that Plaintiff was "[d]ealing with posttraumatic stress as well related to her issues with her bilateral lower extremity amputations.").

Dr. Revell reported to Unum in April 2018 that Plaintiff was "completely and unable to work, and the prognosis for recovery is poor."  *Id.* at AR-1287.  She explained that Plaintiff's "work involves ultimate focus and concentration, and under current conditions this is just not possible."  *Id.* at AR-1286.  She wrote that Plaintiff "exhibited a myriad of symptoms that render her unable to perform her job including panic attacks related to reliving the traumatic event that left her without legs, associated dizziness, numbness in her face and tachycardia."  *Id.*  Dr. Revell further documented that Plaintiff scored a 43 on the Beck Depression Inventory and a 36 on the Beck Anxiety Inventory, indicating severe depression and severe anxiety.[6]  *Id.*; Mental Health Assessment Form, AR-2154.

---

[6] The Beck Inventory is a self-reporting instrument.  It is recognized by the American Psychological Association as a standard diagnostic tool, and research has found it to have a high level of internal consistency.  *See Beck Depression Inventory (BDI),* AMERICAN PSYCHOLOGICAL

**E. May- August 2018**

On May 3, 2018, Plaintiff saw Dr. Wilson again. *See* Encounter Notes, AR-766. Dr. Wilson recommended that "with [her] physical health conditions, mental health conditions and job responsibilities that remaining off work is in [her] best interest." *Id.* Dr. Wilson noted that Plaintiff "has difficulty with keeping her medicine down that is being given to treat her Meniere's disease thus making it difficult for her to do any meaningful work." *Id.* He explained that she now had to take a suppository medication to reduce nausea and vomiting. *Id.* Dr. Wilson wrote that "[i]n regards to [Plaintiff's] chronic anxiety and depression when her anxiety flares up and her legs act up for her Meniere's act up it makes it difficult for her to hold a consistent schedule . . . she has difficulty with maintaining her work which includes time sensitive budgeting projects which she cannot meet." *Id.* at AR-767-768.

Dr. Wilson stated that Plaintiff was "disabled and not likely able to return to meaningful work at any point in the future." *Id.* at AR-766, AR-771. Dr. Wilson made suggestions to Plaintiff regarding her medicine usage but concluded that she did not need to return for three months. *Id.* at AR-771.

After receiving the test results of her VNG study, Plaintiff met with Dr. Isaacson, an otolaryngologist, on May 7, 2018. *See* Visit Notes Dr. Isaacson, AR-744. Dr. Isaacson reviewed Plaintiff's test results, which were "consistent with left-sided [Meniere's] syndrome." *Id.* Plaintiff and Dr. Isaacson discussed a more invasive procedure to treat her symptoms— an ablative procedure. *Id.* Possible side effects of this treatment included deafness and loss of balance. *See*

---

ASSOCIATION, https://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/beck-depression (last visited June 29, 2021). It is widely respected and has been employed in more than 2000 empirical studies. *See* Paul Richter et al., *On the validity of the Beck Depression Inventory. A Review.* 31 Psychopathology 3, 160-68 (1998).

*Meniere's Disease*, NATIONAL INSTITUTES OF HEALTH, AR-2148; *see also* Dep. Norris at 29 (stating that a "risk of Dexamethazone injection in ear is deafness in that ear."). Significantly, Dr. Isaacson "counseled [Plaintiff] to avoid" the procedure, as "she may have difficulty compensating for it." AR-744. Plaintiff is already partially deaf in one ear and already reported balance issues as a bilateral amputee. Dr. Isaacson also suggested a three-week prednisone taper, which, based on prior experience, Plaintiff rejected. *Id.*

On May 15, 2018, Dr. Wilson reported to Unum that Plaintiff was "not able to focus or concentrate while working due to stress which leads to panic attacks. Also frequent bouts of vomiting relating to flares of Meniere's disease which prevent her ability to work. Therefore [Plaintiff] should not perform any work." Medical Intake Form, AR-1339.

At the end of May, Plaintiff was laid off from Glatfelter. *See* Notes Pl. call with Unum Rep (6/21/18), AR-99. Glatfelter clarified that Plaintiff did not have any work performance issues before stopping work and that she was laid off because the position was eliminated. *See* Email from Glatfelter Employee to Unum (7/25/18), AR-328. As a result, Plaintiff lost her employer health insurance. *See* Notes Pl. call, AR-99. She "picked up health insurance" from another source in June, although this seems to have been temporary. *Id.;* Dr. Wilson Encounter Notes (11/10/18) (noting that Plaintiff did not have health insurance).[7]

Also, in June 2018, Plaintiff broke two ribs due to a "fall with prosthetic." Notes Pl. call, AR-99. She wore a brace for the broken ribs and experienced "a lot of pain from that." *Id.*

---

[7] Neither party has argued that Plaintiff became ineligible for either STD or LTD benefits upon being laid off. Indeed, an Unum Representative assured client, who was worried about this exact issue "that this does not impact LTD review as long as she was covered as of [last day worked]." Notes Pl. call (7/13/18), AR-1739.

Plaintiff reported to Unum how her amputations were causing special difficulty with her Meniere's symptoms. *See* Notes Pl. call with Unum Rep (7/13/18), AR-1761. She explained that "[i]t's easier for someone to get to the bathroom that does have legs" and that with her prosthetics "[s]he doesn't have the same ability to be mobile." *Id.* Moreover "[s]he gets hives quite easily. It gets to the point where she cannot wear her legs." *Id.*

In July 2018, Dr. Revell reported to Unum that Plaintiff "continues to display a myriad of symptoms that render her unable to perform her job." Letter to Unum (7/16/18), AR-1416 to AR-1417. She stated that, Plaintiff told her she recently "had an extreme attack of Meniere's. She was walking sideways, had great difficulty keeping from falling, and had violent vomiting and diarrhea. The dizziness continues unabated." *Id.* Dr. Revell concluded that "[i]n general, [Plaintiff's] Meniere's disease greatly aggravates her anxiety. It strikes without warning, causing non-stop vomiting, even bile on an empty stomach." *Id.*

Dr. Revell wrote that since Plaintiff reported that due to her amputations, "she is not able to respond immediately to the need to vomit and has spent many nights sleeping on the bathroom floor." *Id.* at AR-1417.

Plaintiff saw Dr. Wilson on August 8, 2018. *See* Encounter Notes, AR-772 to AR-778. Dr. Wilson opined that Plaintiff could not return to work "in any type of regular full-time stressful position." *Id.* at AR-774. He stated that "part-time non-stressful work might be an option." *Id.* Dr. Wilson ordered Plaintiff to return in three months for her next appointment. *Id.* at AR-778.

## F. Short-Term Disability Benefits approved

The Plan provides for up to twenty-six weeks of short-term disability (STD) benefits if an employee is "certified as unable to perform the material and substantial duties of [her] regular

occupation" and if the employee is "not working in any gainful occupation." *See* Plan Summary, AR-923.

Between February and August, Unum reviewed and approved Plaintiff's claim for STD benefits four times. *See* Claim Approval (2/23/18), AR-1167; Notes from Unum Rep. Review (3/23/18), AR-1239; Claim Approval (5/18/2018), AR-1354; Claim Approval (6/21/2018), AR-1365. These approvals were based on Unum's phone calls with Plaintiff and on medical records provided Plaintiff's treating providers. *Id.*

### G. Part-time employment work during the relevant period

Since being laid off by Glatfelter, despite her symptoms, Plaintiff has worked in several roles. On May 29, 2018, Plaintiff announced on social media that she began working as a "Brand/ Independent Ambassador" for a multi-level marketing ("MLM") company run by India Hicks. *See* Pl. Facebook Post (5/29/18), AR-496; Company Website, AR-2181 to AR-2186. This company "conducts sales solely online" and the ambassadors "are able to work whatever hours they choose from the comfort of their own homes." Company Website, AR-2186; *see also id.* at AR-2182 (website explaining that "ambassadors" have "no inventory to manage, no payroll or overhead."); *id.* at AR-2185 ("An ambassador . . . is building her own lifestyle business, in her own time and on her own terms").

Second, Plaintiff has worked two part-time positions. She began the first, as a cashier for Giambalvo, a car dealership, in July or August 2018. *See* Session Notes from Dr. Revell, AR-749; Notes Pl. call with Unum Rep (8/8/18), AR-331. She worked ten to twenty hours per week and earned $10.50/ hour. *See* Notes, AR-331. Plaintiff reported to Unum that she "had a lot of meniere's attacks" during her first week of training and that her therapist [Dr. Revell] was not happy with her taking a job. *Id.* Plaintiff stated that she "just needed to do something to see if

she can pull it off" and that the job was "not a high pressure or high anxiety." *Id.* Plaintiff gave her notice to the dealership almost as soon as she began, in August 2018. *See* Notes Pl. Call with Unum Rep (9/10/18), AR-379 ("She told them over a month ago that she had to quit."). Importantly, the employer at this position was a family friend. *Id.*

Plaintiff began a part-time position at State Farm Insurance around October 2018. *See* Encounter Notes with Dr. Wilson (11/8/2018), AR-780. This position was "part-time 3 days a week." *Id.* Plaintiff reported that this job "allow[ed] her a little bit more flexibility such that if she has a bad day she can be late or just make up time at another schedule." *Id.* Plaintiff attested that her employer in this position was also a family friend. *See* Pl. Decl., AR-2390. Having the employer be a friend "allowed [her] greater flexibility to miss work when ill than [she] would have received had [she] been employed by a stranger." *Id.* She stated that this job (along with the cashier position) was "far less demanding than [her] regular occupation." *Id.* at AR-2390 to AR-2391. Nonetheless, Plaintiff represented under oath that her "health forced [her] to leave each job as [she] could not regularly attend work and [her] performance was inadequate due to [her] symptoms." *Id.*

Plaintiff now runs a wedding officiant business. In 2018, Plaintiff officiated weddings once or twice per month. *See* Notes Pl. call with Unum Rep. (9/10/2018), AR-379. Plaintiff explained in her Declaration that these weddings "take roughly one to two hours on the day of the ceremony." Pl Decl., AR-2391. She has "obtained a back-up officiant to cover for [her] when [she] is too ill to perform." *Id.* Plaintiff testified that she can "prepare for [the ceremonies] in advance when time and [her] symptoms permit" and that she often "need[s] to medicate so that [she] may complete the ceremony." *Id.*

### H. Personal Life as Reflected on Social Media During the Relevant Period

Defendant conducted Social Media "surveillance" while reviewing her claim for benefits and attached additional evidence of social media activity in its motion for judgment on the pleadings. *See* AR-1655 to AR-1732; AR-1973 to AR-1986; Def. Mot. Judgment, Ex. A, ECF 33-3 to 33-4.

During 2018, Plaintiff updated an album on Facebook entitled "30 days of salads" with pictures of salads and occasionally posted photographs of other foods made at home. *See* Photograph (9/25/18), AR-1974; Photograph (5/4/18), AR-1659; Photograph (5/2/18), AR-1660; Photograph (3/19/18), AR-1677; Photograph (3/6/18), AR-1678; Photograph (3/3/18), AR-1679; Photograph (2/28/18), AR-1680; Photograph (2/27/18), AR-1681; Photograph (2/21/18), AR-1692; Photograph (2/20/18), AR-1692; Photograph (2/19/18), AR-1694; Photograph (2/8/18), AR-1697; Photograph (2/5/18), AR-1698.

In April 2018, Plaintiff posted on Facebook that she and her husband were selling their house privately, without a realtor. *See* Facebook Post (4/10/18), AR-178; *see also* Facebook Post (7/27/18) (advertising an open house). Plaintiff discussed this home move multiple times with her therapist, Dr. Revell. *See* Session Notes (6/12/18), AR-749 ("Husband is working hard on the new house. She can't help as much as he would like."); Session Notes (8/13/18) ("Getting used to new house is a problem since things are not set up for her ADLs."). During the appeal of Plaintiff's claim, Plaintiff and her husband submitted declarations which also discuss the move. *See* Pl. Decl., AR-2391 to AR-2392 ("When we sold our home, my husband did nearly everything related to the sale and move. I felt guilty that I was unable to offer much help."); Decl. of Mark Broomell, AR-2394 ("[W]hen we sold our house, we did so without a realtor. Because Colleen was ill during most of that process, I was required to do most of the work associated with the sale."). It should

be noted that in the same Facebook post, Plaintiff stated that they were moving to a one-floor home near York Hospital.  *See* Facebook Post (4/10/18), AR-179.

During 2018, 2019 and 2020, Plaintiff posted several pictures to her Instagram of activities and travel.  Def. Mot. Judgment Ex. A, ECF 33-3 and 33-4.  These pictures depict Plaintiff visiting Chicago, the Chesapeake Bay, Lake Huron, Texas (including a day trip into Mexico), Virginia, North Carolina and Philadelphia.  *Id.*  There is also a picture of Plaintiff at a Craft Show in York, Pennsylvania.  Ex. A at 4.  Plaintiff clarified in a sworn declaration that this last photograph was from 2014, and she simply re-posted it in 2020.  *See* Supp. Decl. Colleen Dwyer ¶ 5, Pl. Reply Brief Ex. J, ECF 34-3.

Plaintiff also posted two photographs on Instagram in 2020, where it appears that she is driving a car.  *See* Def. Mot. Ex. A at 3-4.  As discussed below, Unum contends that these postings undercut Plaintiff's claim of disability.

### I.  Long-Term Disability Benefits Denied

Under the Plan, once an employee has exhausted her twenty-six weeks of STD benefits, she may receive long-term disability ("LTD") benefits.  *See* Plan Summary, AR-955.  An employee is "disabled" under the Plan when she is "limited from performing the material and substantial duties of [her] regular occupation due to [her] sickness or injury" and has "a 20% or more loss in [her] indexed monthly earnings due to the same sickness or injury."  *Id.* at AR-962.

Material and substantial duties are ones that "are normally required for the performance of [an employee's] regular occupation; and cannot be reasonably omitted or modified, except that if [she is] required to work on average in excess of 40 hours per week, Unum will consider [her] able to perform that requirement if [she is] working or have the capacity to work 40 hours per week." *Id.* at AR-975.

The Plan defines "regular occupation" as "the occupation [the employee is] routinely performing when [her] disability begins." *Id.* at AR-977. Unum "look[s] at [the] occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." *Id.*

Here, Plaintiff worked as a Project and Portfolio Management ("PPM") Process Lead. *See* Pl. Curriculum Vitae, AR-001455; Glatfelter Job Description, AR-1744. Unum conducted a "Vocational Response and Analysis" in assessing Plaintiff's disability claims and determined that Plaintiff's regular occupation most closely matched a "Project Manager" under the Department of Labor's Dictionary of Occupational Titles. *See* Vocational Review, AR-1776. The material and substantial duties of a project manager include reviewing project proposals to plan the time frame, funding, procedures, staffing, and allotment of resources for accomplishing a project. *Id.* at AR-1777. It includes establishing plans for each phase of the project, conferring with project staff, directing and coordinating activities of project personnel, reviewing status reports, and resolving problems. *Id.* The physical demands of the job are low, as it is a sedentary position that requires "occasional lifting, carrying, pushing, pulling up to 10 pounds, mostly sitting." *Id.* The mental and cognitive demands are significant and include "directing, controlling or planning activities of others," "making judgments and decisions . . . solving problems, making evaluations" and "dealing with people." *Id.*

In addition to being limited from performing her job duties, an employee "must be under the regular care of a physician in order to be considered disabled." Plan Summary, AR-962. Regular care means that an employee "personally visit[s] a physician as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat [her] disabling condition(s)" and that she is "receiving the most appropriate treatment and care which

confirms with generally accepted medical standards, for [her] disabling condition(s) by a physician whose specialty or experience is the most appropriate for [her] disabling condition(s) according to generally accepted medical standards." *Id.* at AR-977.

Critically, the employee "must be continuously disabled through [her] elimination period," which ends on the later date of either the first twenty-six weeks of the employee's disability or the maximum date of STD benefits." *Id.* at AR-962. Plaintiff's elimination period was from February 5, 2018 through August 5, 2018. *See* Notes Unum Rep (7/9/18), AR-1372; Plan Summary, AR-955. She became eligible for LTD benefits the next day. *Id.*

Unum began processing Plaintiff's LTD claim in July 2018. Between July and October 2018, Unum collected prescription records and medical reports from Plaintiff's providers. *See* Pharmaceutical Records, AR-1636 to AR-1651; Pharmaceutical Records, AR-2000 to AR-2016; Request for Medical Records from York ENT, AR-1788. Unum also conducted social media surveillance on Plaintiff and spoke with Plaintiff several times. *See* Social Media, AR-1655 to AR-1732; Social Media, AR-1973 to AR-1986; Notes Pl. call (7/11/18), AR-1739; Notes Pl. call (7/16/18), AR-1759 to AR-1768; Notes Pl. call (8/8/18), AR-1817; Notes Pl. call (9/10/18), AR-1865; Notes Pl. call (9/21/18), AR-1944.

The claim was reviewed by an in-house nurse consultant, and then by four in-house physicians, as follows.

### Dr. Kirsch

Dr. Kirsch, an in-house physician for Unum with a background in family medicine, concluded that Plaintiff's reported symptoms and Dr. Wilson's asserted restrictions and limitations were "inconsistent with the medical evidence." Report of Dr. Kirsch, AR-609. His conclusion was based on the limited physical examination findings by Plaintiffs' physicians, the limited

treatment intensity, and Plaintiff's reported activities.  *Id.* at AR-609 to AR-610.  He wrote that Plaintiff's conditions did not render her disabled as of May 7, 2018, when she saw the Dr. Isaacson and "no changes were made in her therapies."  *Id.* at AR-611.

Dr. Kirsch wrote that Plaintiffs' multiple conditions "were considered individually and in aggregate."  *Id.* at AR-610.  "Other" conditions included but were "not limited to bilateral lower extremity below-the-knee amputations, hives, gastroesophageal reflux disease, neuropathy associated pain, fibromyalgia, migraine headaches, and back/ neck pain."  *Id.*  He wrote that these conditions "would not rise to a level that would be considered impairing."  *Id.*

### **Dr. Kletti**

Dr. Kletti, an in-house psychiatrist for Unum, reviewed the psychiatric record.  *See* Report of Dr. Kletti, AR-576.  He concluded that Dr. Revell's opinion was not supported.  *Id.* at AR-575. Specifically, he wrote that "[n]o provider has ever documented any recommendation or referral for psychiatric specialty prescriber evaluation/ care, as would be expected if claimant were suffering from impairing psychiatric illness."  *Id*.

He wrote that Plaintiff "has taken pride in her salad and other meal creations and postings of pictures of same to Facebook."  *Id.* at AR-576.  He concluded that this activity was "markedly inconsistent with impairing psychiatric illness" and were evidence of "normal cognitive abilities and functional activities."  *Id*.

Dr. Kletti concluded that Plaintiff's part-time employment was "markedly inconsistent with impairing mental illness."  *Id.*  Dr. Kletti acknowledged, however, that Plaintiff's part-time employment at the time did "not equate to [her] prior occupational duties."  *Id.*

### Dr. Coughlin

Dr. Coughlin reviewed Dr. Kirsch's findings and concurred with the conclusion. *See* Report of Dr. Coughlin, AR-617. Dr. Coughlin stated that he disagreed with Dr. Wilson and Dr. Revell that Plaintiff "lacks predictable and sustainable capacity to perform any occupation." *Id.* at AR-618. He notes immediately after that Plaintiff had part-time employment. *Id.*

Dr. Coughlin also concluded that Plaintiff's lack of escalation, "unremarkable" exam results, and visitation to Dr. Wilson every three months were inconsistent with an impairing condition. *Id.* at AR-618.

### Dr. Shipko

Dr. Shipko also reviewed the psychiatric findings. *See* Report of Dr. Shipko, AR-602. He concluded that "the opinions of Dr. Wilson and Dr. Revell are not supported because it is [sic] inconsistent with the claimant's activities and inconsistent with findings in office visit notes of Dr. Wilson." *Id.* at AR-603. He writes that if Plaintiff were truly disabled, she "would not be able to predictably show her home, attend the part time work she describes or to predictably be able to perform a wedding." *Id.* Regarding Dr. Wilson's findings, he notes that Dr. Wilson "does not himself identify or treat difficulties with panic attacks." *Id.* Dr. Coughlin writes that Dr. Revell "does not provide any office visit notes" and so does not analyze Dr. Revell's opinion about Plaintiff's psychiatric conditions.

On October 31, 2018, Defendant informed Plaintiff that it had denied her claim for LTD benefits. *See* Denial, AR-785.

### J.  August 2018- April 2019

Plaintiff saw Dr. Wilson on November 8, 2018.  *See* Encounter Notes, AR-2178.  He did not note any changes in her condition.  *Id.*  Dr. Wilson prescribed a scopolamine patch to "see if this helps" with Meniere's symptoms.  *Id.*  He advised her to return in six months.  *Id.* at AR-2179.

Plaintiff next saw Dr. Wilson on March 14, 2019, approximately two months earlier than he had expected her to return.  *See* Encounter Notes, AR-2168-2172.  Dr. Wilson noted that Plaintiff "is definitely struggling with regular symptomatology of dizziness, vertigo, balance issues, nausea and vomiting."  *Id.* at AR-2172.  He reviewed a "symptom log" provided by Plaintiff.  *Id.*  He prescribed a suppository medication, ondansetron, and a prednisone taper.  *Id.* at AR-2168.  Dr. Wilson wrote that "[u]nfortunately measures to this point have not worked in resolving your well over 1-year flare of Meniere's disease. The oral steroids, hydrochlorothiazide daily, Flonase, meclizine as needed, decongestants, various nausea medicines, changes in the Lexapro as well as following a low-salt diet have been tried."  *Id.* at AR-2170.

Dr. Revell and Dr. Wilson wrote assessment forms for Plaintiff that were sent to Unum for Plaintiff's appeal of her LTD benefits denial.  *See* Mental Health Assessment Form, AR-2154 to AR-2161; Medical Assessment Form, AR-2162 to AR-2167.

On March 21, 2019, Dr. Revell wrote an assessment of Plaintiff.  *See* Mental Health Assessment Form, AR-2154.  She wrote that Plaintiff "follows the therapist's recommendations and has good outcomes."  *Id.* at AR-2157.  Nevertheless, she concluded that Plaintiff's prognosis was "guarded", since her PTSD was "continually triggered because the trauma continues with falls and difficulties with activities of daily living due to the amputations."  She stated that Plaintiff's Meniere's disease "also contributes to ongoing trauma, anxiety and depression."  *Id.*  Dr. Revell noted that Plaintiff "experiences difficulty focusing and concentrating, [and] has frequent and

severe panic attacks." *Id.* at AR-2158.  Dr. Revell wrote that Plaintiff's PTSD was triggered by "[f]alls, encounters with violence or aggression, onset of violent episode of vertigo with vomiting, [and] surgery with the need for anesthesia." *Id.* at AR-2159.  Dr. Revell highlighted how Plaintiff's amputations affect her conditions, writing "She can't ever get away from (the difficulty with the prostheses).  With the Meniere's, getting to the bathroom to vomit is an extreme challenge.  The combined impact of all of this is anxiety, discouragement, depression and hopelessness." *Id.* at AR-2157.

Dr. Revell additionally noted that Plaintiff "tries to force activities, to anchor every day with something positive to do." *Id.* at AR-2159.  This includes cooking, which "is a preferred activity because it's not overly stressful." *Id.*

Dr. Revell wrote that Plaintiff's medication to treat episodes causes drowsiness and "can make patient disoriented and confused, making comprehension difficult." *Id.*  She opined that these symptoms and side effects would cause Plaintiff to be absent from work for more than four days in a month. *Id.* at AR-2159 to AR-2160.

On April 2, 2019, Dr. Wilson wrote that Plaintiff's prognosis was "[g]uarded-Poor as she has had current exacerbation of Meinere's for over 1 year w/o improvement despite multiple medication interventions, consultants, testing."  Medical Assessment Form, AR-2162.  He wrote that "nothing has proven completely effective at resolving the vertigo. Meclizine, decongestants, oral steroids, promethazine, Zofran, daily HCTZ have all been utilized to limited success." *Id.* at AR-2162 to AR-2163.  He wrote that Plaintiff has reported experiencing vomiting/ nausea "daily (at least 5x/ week)," "balance dysfunction" three times per week, "lightheadedness" two times per week, "fatigue" five times per week, "tinnitus" daily, and hearing loss in her left ear daily. *Id.* at AR-2163.  He listed Plaintiff's active prescriptions and noted that these medications cause side

effects of drowsiness and sedation. *Id.* at AR-2165. Based on these conditions and the side effects to treatment, Dr. Wilson estimated that Plaintiff would miss at least one week per month of work. *Id.* Finally, Dr. Wilson concluded that "Meniere's disease causes daily dizziness/ nausea. At flares [Plaintiff] can't concentrate, talk on phone, stay in meetings, interact [with] others, or perform any duties of her job. These episodes have been almost daily for past 13 months." *Id.* at AR-2167.

In April 2019, Plaintiff applied for Social Security Disability Insurance benefits. *See* Notification from Pa. Dep. Labor & Industry (5/15/19), AR-2332. The claim was approved by the Social Security Administration in August 2019, retroactive to August 2018. *See* Notice of Award (8/26/19), Compl. Ex. C (ECF 1-3). Plaintiff avers that she continues to receive these benefits today. *See* Pl. Mot. at 29, ECF 32-2.

### K. Appeal Denied

On April 29, 2019, Plaintiff appealed Unum's denial of her claim. *See* Appeal, AR-678 to AR-706. Her claim was reviewed by in-house physicians at Unum: Doctors Scott Norris, and Peter Brown. The decision was made on a paper record without independent examination of Plaintiff. *See* Dep. Dr. Scott Norris, Pl. Mot. Ex. F at 14, ECF 32-9; Dep. Dr. Peter Brown, Pl. Mot. Ex. G at 11 ECF 32-10.

Dr. Norris has worked at Unum since 2010. *See* Dep. Norris at 9. He is board-certified in family medicine, occupational medicine and aerospace medicine. *Id.* at 7; Medical File Review (5/23/19), AR-2292. He has not treated patients since 2010. *See* Dep. Norris at 9. Dr. Norris testified that throughout his career, he has likely treated around five patients with Meniere's disease, with the last case likely being in 2006. *Id.* at 25. None of the patients he has treated with Meniere's disease were bilateral amputees. *Id.*

In his deposition, Dr. Norris testified that he did not doubt Plaintiff's reporting of her symptoms. *Id.* at 37. He did not doubt "the veracity of her primary care physician as to his assessments of [Plaintiff's] condition]." *Id.* at 37-38. And he did not doubt that Plaintiff, consistent with the testimony in her declaration, experiences symptoms several days per week and 111 days per year. *Id.* at 44. Dr. Norris also testified that he "wouldn't have recommended anything in addition to what [Plaintiff's] specialist had recommended." *Id.* at 32.

Nevertheless, in his assessment of her appeal, Dr. Norris found that Plaintiff's

[C]apacity to perform ongoing part-time office and online work was not [consistent with] her report of unpredictable and incapacitating [symptoms] related to Meniere's on 4-6 days per week. Her infrequent fills of small amounts of antiemetic medication were not consistent with severe and frequent nausea/ vomiting… her declination to pursue additional advanced therapy for Meniere's was not consistent with refractory or progressive vertigo.

Medical File Review (5/14/19), AR-2289; *see also* Written Review, AR-2306 to AR-2309. He noted that the record did not indicate that Plaintiff ever required "urgent/ emergent treatment for falls or refractory nausea and vertigo." *Id.* at AR-2290.

Dr. Brown is a psychiatrist who reviewed Plaintiff's psychological conditions. *See* Report Dr. Brown, AR-2294 to AR-2295; AR 2310-2312. Dr. Brown last treated patients in 2000. *See* Dep. Brown at 9. Dr. Brown testified that in his own treatment of patients, he would never "render an opinion . . . without having met with him or her in person." *Id.* at 20.

Dr. Brown cited Plaintiff's social media activities, including selling her house, and concluded that "the level of reported activity is inconsistent with the AP's assertion of pervasive severe impairment in all domains." *Id.* at AR-2311. Rather, he concluded that "in [Plaintiff's] decision not to return to work, situation specific factors appear to predominate." *Id.*

He wrote that "[w]hile there is evidence of a chronic psychiatric condition characterized by symptoms of anxiety and depression of fluctuating severity there is no consistent evidence of significant and sustained symptoms or impairment reported in treatment records during the timeframe in question." *Id.* He noted that "contemporaneous mental status examinations" did not show "evidence of impairment" and that "[t]he level of treatment with predominantly supportive/ expressive psychotherapy and trial of low-dose antidepressant . . . is simply incompatible with severe and ongoing psychiatric impairment or emotional distress." *Id.* at AR-2312.

Defendant provided Plaintiff with a copy of the reports from Dr. Brown and Dr. Norris in May 2019. *See* Letter, AR-2314 to AR-2315. Plaintiff responded to the reports and send an updated prescription drug report. *See* Response, AR-2346 to AR-2354.

Unum denied Plaintiff's appeal on August 16, 2019. *See* Letter, AR-2435 to AR-2444. The letter stated that Plaintiff ceased to be disabled as of May 7, 2018. *Id.* at AR-2436. The letter stated that Plaintiff's treatment history and pharmacy history showed she was not disabled. *See id.* at AR-2440 ("While Ms. Dwyer reported a significant increase in her symptoms resulting in a significant level of impairment her medical treatment remained stable and modest without changes, which would not be expected given her reported increase in symptoms."); AR-2439 ("Additionally, pharmacy records show Ms. Dwyer has refilled her antiemetic medications infrequently, which our physician found inconsistent with her reported severe nausea and vomiting."). The letter notes that Plaintiff saw various specialists only once or twice, that she sees her regular family physician every three months, and that she rejected medical intervention in the form of a steroid injection. *See id.* ("Ms. Dwyer has also declined other treatment options and therapy to address her reportedly impairing vertigo.").

The letter also stated that Plaintiff's part-time employment showed she was not disabled. *See. id.* ("However, she also returned to work in two part-time positions, which is inconsistent with her reported unpredictable and incapacitating symptoms. It is not clear how Ms. Dwyer would be capable of working up to 21 hours per week in one sedentary occupation while also being completely limited from working in another.").

Along with the reasoning discussed above, the letter stated that "[w]hile Ms. Dwyer's bilateral below the knee amputations are acknowledged, the available information shows she worked for many years following this procedure. There is no indication Ms. Dwyer has developed recent complications or issues with her amputation sites." *Id.* at AR-2439. Plaintiff filed this lawsuit on October 11, 2019. *See* Compl., ECF 1.

## IV. Discussion
### A. Plaintiff was disabled under the Plan

Reviewing the record, I find that Plaintiff has shown by a preponderance of the evidence that she is disabled within the meaning of the Plan. I find that the combination of Plaintiff's Meniere's disease, psychological conditions, and status as a bilateral amputee render her disabled such that she cannot perform her regular occupation.

As discussed above, the Regulatory Settlement Agreement governing the Plan requires that significant weight be given to opinions of attending physicians which for practical purposes here includes other providers such as Plaintiff's psychologist. Plaintiffs' attending providers, Dr. Wilson, and her psychologist, Dr. Revell, unequivocally opine that Plaintiff is disabled and cannot perform the duties of her regular occupation. Dr. Wilson provided his opinion that Plaintiff's "current prognosis is Guarded-Poor as she has had current exacerbation of Meniere's for over 1 year [without] improvement despite medication interventions, consultants, testing." AR-2162. He notes that "Meclizine, decongestants, oral steroids, promethazine, Zofran, daily HCTZ have all

been utilized to limited success." *Id.* He further contends that the medications have been "minimally helpful" especially as to Plaintiff's vomiting and nausea. AR-2163. He also states that Plaintiff's medications cause drowsiness and sedation, and that as a result of Plaintiff's impairment and treatment, he anticipates she would miss more than one week per month of work. The intervals at which Plaintiff saw Dr. Wilson were specified by him. Before writing the above-referenced report, Dr. Wilson met with Plaintiff in March 2019. He spoke with Plaintiff about her treatment and her symptoms and reviewed a "symptom log" provided by Plaintiff. AR-2172. He wrote that Plaintiff "is definitely struggling with regular symptomatology of dizziness, vertigo, balance issues, nausea and vomiting." *Id.* Dr. Wilson's opinion is based on his ongoing and consistent treatment of Plaintiff, and I credit his opinion as to Plaintiff's prognosis.

Dr. Revell also opines that Plaintiff cannot maintain her regular occupation. In a Mental Health Assessment Form written for Plaintiff's appeal, Dr. Revell wrote that Plaintiff presents with chronic post-traumatic stress disorder, recurrent major depressive disorder (severe without psychotic features) and agoraphobia with panic disorder. AR-2154. Dr. Revell gave Plaintiff a prognosis of "guarded" because "[t]he post-traumatic stress disorder is continually triggered because the trauma continues with falls and difficulties with activities of daily living due to the amputations. The Meniere's disease . . . also contributes to ongoing trauma, anxiety and depression." *Id.* Dr. Revell writes that Plaintiff "follows the therapist's recommendations and has good outcomes." AR-2157. Nevertheless, she notes issues with Plaintiff's cognitive functioning, since "her lack of ability to focus renders her unable to work. She can only do simple tasks that can be done quickly. With any multi-step task she loses track of what she is doing." AR-2161. Dr. Revell opines that Plaintiff is likely to miss work more than four days a month due to her conditions.

Dr. Revell's assessment is partially based on tests given to Plaintiff, including the Beck Depression Inventory and Beck Anxiety Inventory, which indicated severe depression and severe anxiety. It is also based on her longstanding clinical relationship with Plaintiff. Dr. Revell has been seeing Plaintiff since 2014. Beginning in March 2018, she and Plaintiff met weekly, and as of April 2019, they met every other week.

Defendant objects to Dr. Revell's opinion regarding Plaintiff's Meniere's disease, because she is a psychologist and not a medical doctor. I agree that Dr. Revell is not qualified to opine on Plaintiff's Meniere's prognosis, and I do not rely on her assessments of that condition in coming to my conclusion. But Dr. Revell is qualified to opine regarding the toll exacted by Meniere's disease on Plaintiff against the background of Plaintiff's physical challenges. It is clear throughout the record that stress and anxiety exacerbate Plaintiff's Meniere's symptoms, and vice versa. *See, e.g.* AR-1416 to AR-1417 ("In general, [Plaintiff's] Meniere's disease greatly aggravates her anxiety."); Report from Dr. Wilson to Unum (10/11/18), AR-2070 (I feel the severity of her anxiety and panic attacks add to her inability to work (along with her Meniere's disease)."). I therefore credit Dr. Revell's opinion on how the Meniere's and prostheses affect Plaintiff's psychological conditions and her ability to work. *See, e.g.* AR-2157 ("She can't ever get away from (the difficulty with the prostheses). With the meniere's, getting to the bathroom to vomit is an extreme challenge. The combined impact of all of this is anxiety, discouragement, depression and hopelessness."). Moreover, Dr. Revell's descriptions of Plaintiff's Meniere's symptoms are supported by Dr. Wilson's reports.

Defendant cites to cases where judges express skepticism about the objectivity of treating physicians, assuming loyalty may cloud professional judgment. *See, e.g. Brangman v. AstraZeneca, LP*, 952 F. Supp. 2d 728, 740 (E.D. Pa. 2013). If a court were to adopt that view, in

fairness it would have to employ similar skepticism in evaluating the opinions of a carrier's consulting physicians, who by the same logic would owe a duty of loyalty to the party paying them. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) ("And if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'").[8] Any finder of fact necessarily must weigh the potential for bias on the part of any witness and weigh that potential bias against other evidence on record. Here, given the inherent challenge to Plaintiff as a double amputee and the steps taken by her providers, including Dr. Wilson's referral to specialists, I am persuaded that the opinions they rendered are credible.[9]

One advantage of the treating providers is their familiarity with the patient, particularly where they have followed the patient over a sustained period of time. *See, e.g.*, *Brown v. Cont'l Casualty Co.*, 348 F. Supp. 2d 358, 368 (E.D. Pa. 2004) (Pollak, J.) (noting that "[d]irect contact with a patient over an extended period of time seems especially important for reliable evaluation" of diseases that are "subjective and variable" since "it can allow a more thorough examination of the patient's credibility and true range of abilities."). It may be difficult for consultants to achieve a similar understanding particularly where, as here, the opinions are based purely on a paper record

---

[8] While a fiduciary's potential conflict of interest is a relevant factor in cases brought under the arbitrary and capricious standard of review, *see Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 115-17 (2008), it is not relevant on *de novo* review, where the record is assessed independently. *See Viera*, 642 F.3d at 418. Nonetheless, bias and credibility are important factors when making findings of fact as I am required to do under Federal Rule of Civil Procedure 52.

[9] The sole criticism I can level against Dr. Wilson stems from Plaintiff's medical assessment form submitted as part of her administrative appeal, where Dr. Wilson states that she suffers from some Meniere's symptoms "daily." Elsewhere both Plaintiff and her doctors describe her Meniere's disease as waxing and waning in severity. But symptoms would be present daily during acute flares, and I therefore view this note in the record as being merely imprecise rather than exaggerated or dishonest.

with no physical exam of the patient. *See, e.g. Heim v. Life Ins. Co. of N. Am.*, No. 10-1567, 2012 WL 947137, at *10 (E.D. Pa. Mar. 21, 2012) (Ditter, J.) (noting that even where an insurance policy "clearly did not require" an Independent Medical Exam, it would nonetheless have provided additional useful information, especially when the plaintiff's claim was largely based on subjective complaints). It is certainly relevant that to a large degree Defendant's consultants did not doubt Plaintiff's veracity in her reported symptoms or her physician's belief in their diagnosis.[10]

Of critical importance to my decision is the fact that Plaintiff's legs are amputated below the knees. While Meniere's symptoms could be disabling in other circumstances, it is clear here how a disease that leads to dizziness, vertigo, and lack of balance would be physically disabling to someone with these amputations, and how the fear of falling and anxiety surrounding the condition would lead to disabling psychological distress such as that reported here. *See, e.g.*, AR-1761 ("[Plaintiff] gets hives quite easily. It gets to the point where she cannot wear her legs sometimes. It's easier for someone to get to the bathroom that does have legs. She has leg prosthetics. She doesn't have the same ability to be mobile."). Plaintiff's amputations make her Meniere's diagnosis more challenging physically, but also psychologically in that she experiences PTSD associated with falling, feels fearful of leaving her house too often, and endures "humiliating" experiences, such as sleeping on the bathroom floor. One fact that stands out is Plaintiff's fall in June 2018, where she broke two ribs. This does not just underscore the impact of her Meniere's disease on the challenges faced by a double amputee, but also emphasizes that

---

[10] In *Nord*, the Supreme Court held that ERISA does not require "administrators automatically to accord special weight to the opinions of a claimant's physician." *Nord*, 538 U.S. at 834. Here, the Regulatory Settlement Agreement governing Unum's administration of plans requires that treating physicians' opinions be given significant weight unless those opinions violate professional standards and are contradicted by substantial evidence. The RSA was entered into the year after the *Nord* decision and does not rely on authority overruled by that decision.

the risks giving rise to her anxiety are real. Given the challenges faced by Plaintiff, the type of anxiety described by Dr. Revell makes sense.

In that regard, Plaintiff convincingly argues that while Defendant "acknowledges" Plaintiff's multiple conditions individually, the analysis done by its consultants does not adequately recognize the combined effect of these conditions in rendering Plaintiff disabled. *See, e.g.*, AR-2439 ("While Ms. Dwyer's bilateral below the knee amputations are acknowledged, the available information shows she worked for many years following this procedure. There is no indication Ms. Dwyer has developed recent complications or issued with her amputation sites."). In the final analysis, Defendant attaches far too much significance to Plaintiff's prior success in coping with her limitations, and unrealistically minimizes the impact of her worsening condition.

A person is disabled under the Plan when she is "limited from performing the material and substantial duties of her regular occupation due to her sickness or injury." Material and substantial duties are ones that are required for performance of the occupation and cannot be reasonably omitted or modified. Plaintiff's "regular occupation" duties as established by Unum require planning, directing and coordinating activities to ensure that project objectives are accomplished within a prescribed time frame and within funding parameters. Plaintiff has shown beyond a preponderance of the evidence that she is not able to perform these duties. First, the unexpected nature of the symptoms mean that she could routinely be interrupted in the middle of projects. Second, the additional difficulties caused by Plaintiff's amputations and psychological conditions mean that recovery from an episode can take multiple hours. Third, the only medication that has effectively treated Plaintiff's physical symptoms leads to drowsiness, sedation, and an inability to manage complex tasks. Fourth, Plaintiff is understandably anxious about and distracted by her vulnerability, including her embarrassment in public settings caused by the nature of some of her

symptoms. Accordingly, Plaintiff's conditions prevent her from performing the duties of her regular occupation.

The Plan also requires that the person seeking LTD benefits has a twenty percent or more loss in her indexed monthly earnings due to the sickness. Defendant does not contest this point, and it is clear that Plaintiff has experienced such a loss.

Finally, an applicant for LTD benefits must be continuously disabled during the "elimination period," in this case the twenty-six weeks between February 5, 2018 and August 5, 2018. Plaintiff has shown that she was disabled during that period. Indeed, Defendant continuously renewed Plaintiff's short-term disability (STD) claims during that exact period. It was only when Plaintiff became eligible for long-term disability benefits, and the burden to pay for these benefits shifted from Glatfelter to Defendant, that Defendant re-examined its assessment and concluded that Plaintiff had not been disabled beginning in May 2018. Defendant argues that Plaintiff places too much emphasis on the STD benefits; as a legal matter, they note that they are not bound by the STD determination, and as a factual matter they claim that they reviewed additional evidence in the interim period which altered their decision. I do not rely on Defendant's granting of the STD benefits in reaching my conclusion here. Rather, independently viewing the evidence of Plaintiff's disability during the relevant time period, I find that she has shown that she was disabled.

In addition to giving significant weight to attending physicians' opinions, the RSA requires that Defendant "give significant weight to evidence of an award of Social Security disability benefits as supporting a finding of disability, unless [Defendant has] compelling evidence that the decision of the Social Security Administration was (i) founded on an error of law or an abuse of discretion, (ii) inconsistent with the applicable medical evidence, or (iii) inconsistent with the

definition of disability contained in the applicable insurance policy."[11]   The Social Security Administration approved Plaintiff's claim ten days after her appeal for LTD benefits was denied, and so Defendant did not consider this when analyzing her appeal.  *See* Pl. Compl. Ex. C, ECF 1-3.  As discussed below, there is no "compelling evidence" in the record to suggest that the SSA's decision is inconsistent with the applicable medical evidence, just as there was no "substantial evidence" to suggest that the opinions of the attending physicians were inconsistent with the facts.  There is also no evidence in the record, and certainly no compelling evidence, to suggest that the SSA decision was founded on an error of law or an abuse of discretion or that it was inconsistent with the definition of disability contained in the applicable insurance policy.  Accordingly, I give significant weight to the fact that Plaintiff's claim for SSDI was approved and that, to the Court's knowledge, she continues to receive this benefit.

Based on the record, I find that Plaintiff was continuously disabled and should not have been denied LTD benefits under the Plan.

### B.  Defendant's Arguments Regarding Plaintiff's Medical Treatment

Having set forth my reasoning as to Plaintiff's eligibility under the Plan, I find it appropriate to explain why I am not persuaded by Defendant's arguments.  Defendant argues that, notwithstanding the attending physicians' opinions, the medical evidence did not support a finding of disability.  In particular, Defendant focuses on (1) the lack of escalation of treatment and low use of medication, and (2) the lack of direct observation of active Meniere's symptoms by the physicians.

---

[11] Given these provisions in the RSA, Defendant's citation to case law seeking to discount the significance of a finding of disability by the SSA carries little weight.

### i.     Lack of Escalation of Treatment/ Medication

Defendant contends that if Plaintiff were truly disabled, she would have continuously escalated her medication and/ or treatment by physicians.  *See, e.g.* AR-2440 ("While Ms. Dwyer reported a significant increase in her symptoms resulting in a significant level of impairment her medical treatment remained stable and modest without changes, which would not be expected given her reported increase in symptoms."); AR-2439 ("Additionally, pharmacy records show Ms. Dwyer has refilled her antiemetic medications infrequently, which our physician found inconsistent with her reported severe nausea and vomiting.").  They note that Plaintiff saw various specialists only once or twice, that she sees her regular family physician every three months, and that she rejected medical intervention in the form of a steroid injection.  Plaintiff responds that the lack of escalation is "due to the simple fact that her condition was unchanged, she lost her employer-provided health insurance, and there were no additional treatment options available to her beyond that which she was receiving."  Pl. Resp. at 9, ECF 34.  Based on the record, I find Plaintiff's explanation convincing and reject Defendant's argument that lack of escalation signifies a lack of continuing disability.

Plaintiff saw her family physician, Dr. Wilson, in January and February 2018 when she first experienced the current onset of Meniere's symptoms.  Dr. Wilson prescribed medication and recommended that Plaintiff not work for the time being.  He also recommended that she see specialists. Plaintiff saw one specialist, Dr. Good, in February 2018 and March 2018.  Dr. Good recommended that Plaintiff continue with her current medication, noted that she was not benefitting from the steroid prednisone, and referred Plaintiff to another specialist, Dr. Isaacson.

Dr. Isaacson conducted studies and exams regarding Plaintiff's condition.  Dr. Isaacson and Plaintiff discussed a procedure that may be able to help her symptoms— a steroid (Dexamethazone) injection into Plaintiff's ear.  It is, however, highly significant that Dr. Isaacson

"counseled [Plaintiff] to avoid" the procedure given the possible side effects; in particular, the injection can lead to deafness and loss of balance, which was of extreme concern to Plaintiff, given her existing balance difficulties as a bilateral amputee and her significant hearing loss in one ear. Outside of this procedure, Dr. Isaacson could only suggest that Plaintiff once again try a regimen of the steroid prednisone, which Plaintiff rejected due to its inefficacy in treatment. Plaintiff's refusal aligned with Dr. Good's observation that the prednisone had not worked.

Plaintiff has taken a myriad of medications to treat Meniere's symptoms and her other conditions. Plaintiff avers that when she takes medication for Meniere's disease, the medication "knocks her out." Plaintiff is thus stuck between a proverbial rock and a hard place: when she does not medicate, she can experience debilitating symptoms such that she cannot work, and when she does take medicine, the side effects often render her equally unable to work. Although she has refilled her prescription medications, she does so relatively infrequently, due to their reported side effects.

Plaintiff's medication regimen— and the side effects associated with it—did not relieve her symptoms and, as a result, she was unable to return to work. After consulting with specialists and her regular physician, she made the reasonable informed decision that escalation was not an option either. Put simply, she had no option that would allow her to return to her full-time job. Dr. Norris, who reviewed Plaintiff's appeal for Defendant admitted that he "wouldn't have recommended anything in addition to what [Plaintiff's] specialist had recommended." Dep. Norris at 82. Plaintiff's decision to forgo additional specialists and refills of medication was reasonable under the circumstances. As noted above, she lost her job, and thus her regular health insurance, in May 2018.

For practical purposes, Plaintiff had reached a plateau. Even the specialist she consulted did not recommend an invasive, potentially dangerous procedure, and the medication's efficacy was limited. Escalation of care is warranted where there is a reasonable expectation that it will change a patient's situation, but not every treatment yields improvement. Given this history, the lack of escalation does not conclusively demonstrate the absence of a disability during the elimination period.

Defendant's arguments are similarly unavailing with regard to Plaintiff's psychological treatment, which has remained consistent throughout the elimination period and beyond. Plaintiff saw her psychologist, Dr. Revell, weekly and then every other week, through April 2019. Both in their evaluation of Plaintiff's claim, and in the instant case, Defendant focuses on the lack of escalation of treatment as a reason to discredit Plaintiff's contention that she is disabled. *See, e.g.*, AR-2312 ("The level of treatment with predominantly supportive/ expressive psychotherapy and trial of low-dose antidepressant … is simply incompatible with severe and ongoing psychiatric impairment or emotional distress"); AR-576 ("No provider has ever documented any recommendation or referral for psychiatric specialty prescriber evaluation/ care, as would be expected if claimant were suffering from impairing psychiatric illness."). I disagree. Plaintiff has been tested on the Beck inventory and has been shown to have severe anxiety and severe depression, among other conditions. She and her therapist, with whom she has a multi-year relationship, have made the reasonable decision to pursue a course of anti-depressants and anti-anxiety medication while continuing with frequent and consistent therapy sessions. Given Plaintiff's diagnoses, which include agoraphobia "without psychoses," it does not follow that her decision to continue treatment with Dr. Revell proves that Plaintiff lacks disabling psychological conditions.

Defendant's consultants also attached significance to the fact that Plaintiff is being managed with Lexapro, a medication widely considered less potent than other drugs used in the treatment of psychiatric conditions. But Lexapro was specifically approved by the Food and Drug Administration for the treatment of "major depressive disorder," in addition to treatment of a generalized anxiety.[12] As discussed above, I found that these conditions are disabling *in conjunction* with her physical conditions, making the lack of escalation even less relevant.

### ii. Physical symptoms not actively observed

Defendant also argues that the opinions of Plaintiff's physicians should be discounted because they never observed her active symptoms. This contention is unsupported by the record, as Dr. Wilson observed Plaintiff's symptoms when he saw her in January 2018, just before the elimination period. *See* AR-764 to AR-765 (noting that Plaintiff "[d]oes have nystagmus on lateral eye motion bilaterally . . . [H]er symptoms are in both eyes.").

More importantly, however, Plaintiff never contended that her condition existed for twenty-four hours per day, seven days per week; to the contrary, she is explicit that this condition waxes and wanes in an unpredictable pattern. *See, e.g.* AR-721 ("Her typical episodes last several hours and are associated with nausea and at times vomiting. Between episodes she is asymptomatic."); AR-718 ("Occurs at unpredictable times.").

Given that her reported symptoms include nausea, diarrhea, and extreme vertigo, it also is reasonable that Plaintiff would stay home from the doctor's office and not drive when experiencing symptoms. Defendant's in-house doctors admitted that they had no reason to doubt the credibility

---

[12] *Highlights of Prescribing Information (Lexapro)*, FOOD AND DRUG ADMINISTRATION, https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/021323s047lbl.pdf

of Plaintiff nor of her treating physicians. *See, e.g.*, Dep. Norris at 37 ("Q. Do you doubt the veracity of Ms. Dwyer as to her reporting of her symptoms? A. No, I don't doubt her reporting of her symptoms."); Dep. Brown at 18-20.

Defendant's argument regarding symptoms carries less weight concerning Plaintiff's psychological conditions. For example, when reviewing Plaintiff's appeal, Dr. Brown at Unum wrote that "the contemporaneous mental status examinations show no evidence of cognitive, affective, or behavioral impairment." AR-2311 to AR-2312. But Dr. Revell's notes suggest that Plaintiff manifested anxiety, depression and PTSD when visiting her office, including when she completed the Beck inventory during an appointment. Indeed, given the understandably limited nature of the session notes provided by Dr. Revell, the record does not indicate one way or the other whether Plaintiff manifested various psychological symptoms at her weekly or semi-weekly appointments. Just because these notes do not say explicitly, for example, that Plaintiff experienced a panic attack while in her therapist's office, is no reason to discount her doctor's diagnoses. And as noted above, to the extent that fear of falling is one of the sources of anxiety, there was nothing speculative about Plaintiff's June 2018 fall fracturing her ribs.

Defendant relies at length on two decisions to support its position that the clinical findings and lack of escalation necessarily signify that Plaintiff was not disabled. *See Allen v. Unum Life Ins. Co. of Am.*, 142 F. App'x 907 (6th Cir. 2005) (per curiam); *Ford v. Unum Life Ins. Co. of Am.*, 351 F. App'x 703 (3d Cir. 2009) (per curiam). As an initial matter, I note that these decisions are per curiam and non-precedential and therefore carry little weight. *See Allegheny Cnty Emps Ret. Sys. v. Energy Transfer LP*, 20-200, 2021 WL 1264027, at *27 (E.D. Pa. Apr. 6, 2021).

More importantly, and of critical importance here, those cases involved a fundamentally different standard of review, with the sole question being whether Unum's decision was arbitrary

and capricious. *See Allen*, 142 F. App'x at 908; *Ford*, 351 F. App'x at 705. The issue before both district courts was limited to the narrow question of whether Unum's decision was rational, even if reasonable people might disagree over the outcome. *See Allen*, 142 F. App'x at 913; *Ford*, 351 F. App'x at 707-08. My review here is *de novo*, augmented by the RSA, and applying that broader standard to a far more compelling factual record leads me to a different result.

On the whole, Defendant's medical analysis of Plaintiff, which greatly discounted if not ignored outright, her attending physicians' opinions, is not persuasive. Based on Plaintiff's conditions and based on the record before me, I disagree with Defendant that more "objective" evidence was needed to support the attending providers' opinions. *See Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 442 (3d Cir. 1997) (holding it was arbitrary and capricious for an administrator to require additional, unspecified "objective" evidence where plaintiff's chronic fatigue syndrome was supported by subjective reports and treating physicians' opinions); *Kelly v. Reliance Standard Life Ins. Co.,* No. 09-2478, 2011 WL 6756932, at *11 (D.N.J. Dec. 22, 2011), *aff'd sub nom. Kelly v. Penn Mut. Life Ins. Co.*, 764 F. App'x 160 (3d Cir. 2019) (finding that the defendant's decision was arbitrary and capricious where it "conducted an inappropriately selective review of the evidence, placed unreasonable emphasis on the reports of consultants who never examined [the plaintiff], [and] chose not to use an [Independent Medical Exam]."); *Elms v. Prudential Ins. Co of Am.*, No. 06-5127, 2008 WL 4444269, at *14 n.21 (E.D. Pa. Oct. 2, 2008) ("[P]lan administrators must be wary of denying claims because of lack of objective evidence when the disabling condition on which the claimant rests her case rests heavily on subjective evidence.").

### C. Defendant's Non-Medical Arguments
#### i. Part-time positions

Since losing her job with Glatfelter, Plaintiff has held several part-time positions. Defendant contends that her ability to work these positions proves that she is not disabled. *See*

Def. Cross-Mot. for Judg. at 27-28, ECF 33-1; Denial of Appeal Letter, AR 2439-2440. However, each of these positions are flexible and accord with Plaintiff's described disabilities. Plaintiff's ability to work part-time in a flexible role does not prove that she is able to resume her the duties of her regular occupation. There are four positions discussed by the parties.

First, Plaintiff has worked as an "ambassador" for a multi-level marketing (MLM) company run by India Hicks. This company, as with most MLM companies, conducts sales solely online, and the salespeople "are able to work whatever hours they choose from the comfort of their own homes." AR-2186. Defendant does not attempt to argue that Plaintiff works a full-time or even part-time schedule in this position, or that it otherwise resembles her regular occupation in terms of the skills and time required. The mere existence of this role does not undermine Plaintiff's disability claim.

Second, Plaintiff has worked two part-time positions, one as a cashier at a car dealership and one with an insurance company. Plaintiff avers that both of these positions allowed her a much higher degree of flexibility than her Project Manager role at Glatfelter— she was allowed to change days as needed to accommodate her illness, and the employers were family friends. *See* Pl. Decl., AR-2390. In Plaintiff's part-time role with State Farm Insurance, she had "flexibility such that if she ha[d] a bad day, she [could] be late or just make up time at another schedule." AR-780. And even with this increased flexibility, Plaintiff's health "forced [her] to leave each job as [she] could not regularly attend work and [her] performance was inadequate due to [her] symptoms." *Id.* Plaintiff's ability to function in low-stress, part-time jobs in business run by family friends is not inconsistent with disability, particularly as it is defined under the terms of the Plan.

Finally, Plaintiff now runs a wedding officiant business. Defendant argues that this shows Plaintiff is not disabled, since the business requires "effectively committing to customers to conduct their weddings at specific times." Def. Resp. at 12, ECF 35. Plaintiff testified, however, that she has "obtained a back-up officiant to cover for [her] when [she] is too ill to perform." Pl. Decl., AR 2390. I acknowledge that part of Plaintiff's testimony here seems contradictory: she states that she can "prepare for [the ceremonies] in advance when time and [her] symptoms permit" and that she often "need[s] to medicate so that [she] may complete the ceremony." *Id.* In that same document, however, Plaintiff testifies that medication "knocks her out," and renders her so drowsy that she cannot complete an eight-hour workday. *Id.* at AR-2391. This relatively minor inconsistency does not outweigh all the other evidence in Plaintiff's favor, however, especially given that Plaintiff testifies that the commitment time on the day of a ceremony is one to two hours, and that the nature of officiating is distinct from many of her regular occupational duties such as "keeping up with time sensitive projects" and consistently meeting productivity goals. *Id.*

In depositions of the in-house consultants who reviewed Plaintiff's claim, the physicians admitted that they were not aware of these flexible aspects of the part-time positions. *See* Dep. Norris at 18 ("Q. Did you know that she could set her own hours at those jobs as she saw fit and as her health permitted?" "A. Yeah, I don't recall seeing that at the time."); Dep. Brown at 17 ("And were you aware that the part-time job as a cashier was working for a family friend?" "A. No, I did not. No, I was not."). It is also clear that Defendant's denial of Plaintiff's appeal did not account for the flexibility she was afforded. *See* Denial Letter, AR-2439 ("However, she also returned to work in two part-time positions, which is inconsistent with her reported unpredictable and incapacitating symptoms. It is not clear how Ms. Dwyer would be capable of working up to

21 hours per week in one sedentary occupation while also being completely limited from working in another.").

Further, Defendant's doctors admitted that they did not compare the job responsibilities of the part-time roles to Plaintiff's regular occupation from which she claimed disability— a crucial error. *See* Dep. Brown at 16; Dep. Norris at 18. Dr. Revell stated that Plaintiff is "likely to be absent from work" for "more than four days a month" as "a result of her mental health symptoms or the treatment of her symptoms." AR-2159. While missing four days per month may be incompatible with the time-sensitive nature of Plaintiff's duties in her regular occupation, it may not conflict with a three-day-per-week job at State Farm where Plaintiff can change and make up hours as needed. Defendant's argument is also belied by testimony from an in-house reviewer who worked on Plaintiff's claim, who admitted that Plaintiff did not "perform the same regular occupation on a part-time basis as she had been performing on a full-time basis for [Glatfelter]." Dep. Kurt Phillips, Pl. Mot. Ex. E at 11, ECF 32-8. The "failure to consider Plaintiff's specific job demands is a significant oversight" and suggests that the decision reached "was not reasoned and based on an individualized assessment of her abilities." *Loomis v. Life Ins. Co. of N. Am.*, No. 09-3616, 2011 WL 2473727, at *5 (E.D. Pa. June 21, 2011); *see also Kelly*, 2011 WL 6756932, at *11(finding that the defendant "failed to engage in any meaningful analysis of [plaintiff's job duties] which, together with other errors "amount[ed] to an arbitrary and capricious exercise of discretion in violation of ERISA."). Indeed, nothing in the record suggests that Plaintiff's duties in these part-time positions resembled those of her regular occupation; she worked as a cashier in one job, and her job role at State Farm is not provided. And in any event, Plaintiff left both these positions.

The nature, flexibility, and time-commitments of Plaintiff's other work are distinct from her regular occupation before becoming disabled. Even when working part-time, her job responsibilities have not mirrored those of her regular occupation. Her ability to perform this work has not been consistent and does not undermine her professed disability.

### ii. Social Media Activity

Defendant points to selected activities from Plaintiff's social media accounts to argue that she is not disabled. Although social media can sometimes provide relevant information in assessing claims, Defendant here attaches too much significance to the limited information at hand. Especially when considering a disability that waxes and wanes, Defendant's heavy reliance on these pictures, which capture only brief snapshots in time, is ill-founded.

For example, Defendant notes repeatedly that Plaintiff and her husband "completed a for sale by owner sale" of their home, arguing that this would not have been possible if Plaintiff were truly disabled. *See, e.g.*, AR-2440; Def. Mot. at 11, ECF 33-1. First, the record shows that Plaintiff and her then-husband sold their house to move to a one-story home. This is consistent with Plaintiff's reported severity of dizziness and vertigo. Second, the social media post at issue reveals no specific information about how many hours per week Plaintiff dedicated to answering messages, showing the house, or any other tasks associated with selling a house. Third, Plaintiff has said repeatedly throughout the record that her husband took the lead on selling the house, and her husband has attested to the same. Plaintiff even spoke to her therapist numerous times about the guilt she felt regarding her inability to help her husband with the move.

Defendant also points to pictures from Plaintiff's online account as weighing against disability. Defendant notes several pictures showing that Plaintiff has traveled, including to Chicago, Texas and North Carolina. Again, however, these social media posts are more notable

for what they do not say than for what they do. Plaintiff has always maintained that she has a waxing and waning condition, and these photographs do not show anything other than that Plaintiff was able to reach that destination.

In another example, Defendant includes a picture of Plaintiff at an art fair. Plaintiff responds with a sworn declaration explaining that this photo was taken in 2014. This factual error is emblematic of the peril of taking any given social media posting at face-value without necessary context.

Lastly, Defendant focuses repeatedly on a picture taken of Plaintiff in a car, to argue that since she is driving, she is not disabled. I agree that evidence of Plaintiff's driving fails to comply with recommendations by her providers at some points during her care. Viewing the record in its entirety, Dr. Wilson and Dr. Revell counseled against Plaintiff driving early in her Meniere's disease flare up. As of July 2018, Plaintiff herself reported to Defendant that she continued to drive on days when she did not feel dizzy. AR-278. There is no duplicity on Plaintiff's part. Neither she nor her health care providers have contended that she is entirely precluded from basic daily living activities such as driving. Accordingly, the fact that Plaintiff has admittedly driven at least twice over the past several years does not suffice to outweigh all the other evidence in the record.

The record reflects that Defendant, in denying Plaintiff's claim, has gone to extremes in scouring Plaintiff's social media for any sign of normal life activity. For example, Defendant charges that "you take pride in your salad and other meal creations," referring to various photographs Plaintiff had posted of salads (at home). Letter Denial of LTD Benefits, AR-789. I can only agree with Plaintiff's counsel's response that proffering this as a reason to deny disability benefits "is so patently absurd it nearly does not merit a response." Pl. Admin. Appeal, AR-703.

The social media evidence in the record does not contradict either Plaintiff's or Plaintiff's physicians accounts of her conditions.

## V. Remedy

Having concluded that Plaintiff has shown she was disabled during the elimination period and that her benefits were wrongly denied, I must fashion an appropriate remedy. District courts have "considerable discretion" in fashioning a remedy under ERISA. *Vastag*, 2018 WL 2455921, at *15 (citations omitted); *see also Cook v. Liberty Life Assur. Co. of Bos.*, 320 F.3d 11, 25 (1st Cir. 2003).

### i. Plaintiff should be granted past-due LTD benefits through August 5, 2020

When reviewing claims under the arbitrary and capricious standard of review, the Third Circuit has held that "it is appropriate to remand to the administrator for full consideration of whether the claimant is disabled" when benefits are improperly denied at the outset. *Miller v. American Airlines, Inc.*, 632 F.3d 837, 856 (3d Cir. 2011). In contrast, when conducting *de novo* review, though there is no binding Third Circuit precedent, courts have held "a remand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that the denial of benefits based on the record was unreasonable." *Vastag*, 2018 WL 2455921, at *15 (quoting *Cook*, 320 F.3d at 24; *see also Zervos v. Verizon New York, Inc*., 277 F.3d 635, 648 (2d Cir. 2002) (holding that remand was an inappropriate remedy where the record was complete and the denial of benefits was unreasonable); *Grosz–Salomon v. Paul Revere Life Ins. Co*., 237 F.3d 1154, 1163 (9th Cir. 2001) ("[A] plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts.").

Here, the appropriate remedy is the granting of LTD benefits which Plaintiff was due under the Plan for twenty-four months after she became eligible on August 5, 2018. Defendant argues that this remedy is not appropriate because there is no information of record since Plaintiff's appeal was denied in August 2019. But the record lacks this information precisely because Defendant improperly denied her benefits in the first place. I agree with the First Circuit that "[i]t would be patently unfair to hold that an ERISA plaintiff has a continuing responsibility to update her former insurance company and the court on her disability during the pendency of her . . . litigation, on the off chance that she might prevail in her lawsuit." *Cook*, 320 F.3d at 24-25; *see also Levine v. Life Ins. Co. of N. Am.*, 182 F. Supp. 3d 250, 266 (E.D. Pa. 2016) (Rufe, J.) ("[R]emand is unnecessary where the claimant would have received benefits had the correct review been performed.").

Further, as Plaintiff notes, Defendant did not seek to depose Plaintiff during this litigation, and notwithstanding Defendant's denial of the claim, there was no impediment to Defendant requesting updated medical records during discovery.[13] There is no evidence in the record suggesting that Plaintiff's condition has improved since her appeal was denied. *See Billings v. Unum Life Ins. Co. of Am.*, 459 F.3d 1088, 1097 (11th Cir. 2006) (finding the lack of evidence of improvement was sufficient to support the district court's decision in fashioning a similar remedy). In real world terms, to adopt Defendant's position here and grant a full remand would render litigation by claimants such as Plaintiff a virtual impossibility, because such claimants would repeatedly have to climb a steep mountain only to return to its base again and again in seeking benefits due under a disability plan. Accordingly, Plaintiff is awarded LTD benefits from August 5, 2018 through August 5, 2020.

---

[13] *See Dwyer,* 470 F. Supp. 3d at 439 n.3 (stating that "there would be no limitation upon Unum's ability to depose Plaintiff's medical providers.").

### ii. A Partial Remand for Limited Factual Findings is Appropriate

The Plan calculates the amount of LTD benefits based on certain factual determinations, however, and a limited remand is warranted to that extent. For example, the amount of the payment may change depending on Plaintiff's earnings throughout the past twenty-four months. *See* AR-121. It will also be discounted by the amount of Social Security Disability Income and, if applicable, any retirement benefits Plaintiff may be receiving from Glatfelter. *See* AR 122-23.

Defendant suggests that they may also analyze whether Plaintiff is entitled to LTD benefits for the twenty-four-month period, given that the Plan contemplates cancellation if, for example, Plaintiff is able to work in her regular occupation on a part-time basis but does not. AR-125; Def. Mot. for Judgment at 36, ECF 33-1. Defendant is advised that I have already found, as explained above, that Plaintiff has shown she cannot work in her regular occupation in any capacity. This remand is for the sole purpose of calculating the amount due, and not for re-examining factual findings made herein.

### iii. Remand is Appropriate for Factual Findings Beyond the Initial Twenty-Four-Month Period

The Plan changes in several respects after a claimant has received LTD benefits for twenty-four months. The record does not contain enough information to determine how these changes apply to Plaintiff, and so I will remand her claim to the extent she continues to claim disability beyond August 5, 2020.

The Plan includes a "lifetime cumulative maximum benefit period" of twenty-four months for all disabilities due to mental illness. AR-125. Because I have concluded that Plaintiff's condition is not solely based on mental illness, however, I do not find that her benefits are limited by this cap.

Additionally, after twenty-four months of LTD benefits for any other condition, payment will only continue if Plaintiff is "unable to perform the duties of *any gainful occupation* for which [she is] reasonably fitted by education, training or experience." AR-119 (emphasis added). Plaintiff urges that I find she is disabled under this definition, because she continues to receive SSDI benefits, which likewise require that disability prevent the claimant from doing "any substantial gainful activity." 20 C.F.R. § 404.1505. However, the regulatory standard and evaluation process for SSDI is somewhat different from that of the Plan, *see* 20 C.F.R. § 404.1520, and the record lacks information as to the standards used by the SSA and the reasoning driving their decision to award benefits. I therefore do not decide the merits of Plaintiff's claim after August 5, 2020.

### iv.    Prejudgment Interest

The parties agree that upon an award of past benefits, I may award prejudgment interest. "Prejudgment interest exists to make plaintiffs whole and to preclude defendants from garnering unjust enrichment." *Nat'l Sec. Systems, Inc. v. Iola*, 700 F.3d 65, 102 (3d Cir. 2012); *see also Anthuis v. Colt Indus. Operating Corp.*, 971 F.2d 999, 1010 (3d Cir. 1992) ("[P]rejudgment interest should ordinarily be granted unless exceptional or unusual circumstances exist making the award of interest inequitable.") (quoting *Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 750 (8th Cir. 1986)). I find that in this case, circumstances including the length of litigation and the loss of income borne by Plaintiff merit an award of prejudgment interest.

The Third Circuit has "not offered extensive guidance for deciding what rate of interest is appropriate in a given case." *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 208 (3d Cir. 2004) (quoting *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 131-32 (3d Cir. 2000)) (internal alterations omitted). Rather, "the awarding of prejudgment interest under federal

law is committed to the trial court's broad discretion."  *Id.* (quoting *Ambromovage v. United Mine Workers of America*, 726 F.2d 972, 981-82 (3d Cir. 1984)); *see also Jones v. Unum Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000) ("In a suit to enforce a right under ERISA, the question of whether or not to award prejudgment interest is ordinarily left to the discretion of the district court.").  Defendant suggests I use the rate for post-judgment interest rate outlined in 28 U.S.C. § 1961, which as of July 2021 is approximately .08%.  *See 1-Year Treasury Constant Maturity Rate*, FEDERAL RESERVE BANK OF ST. LOUIS.[14]  I find that this rate is insufficient to serve the purpose of prejudgment interest in making Plaintiff whole and preventing unjust enrichment.  Plaintiffs suggest that I use the default interest rate under Pennsylvania law, which is 6%.  I find this rate of interest lacks a sufficient nexus to current economic conditions to be reasonable.  Because Plaintiff was deprived of the use of the funds, I am persuaded that a more realistic approach is grounded in the Prime Rate.[15]  *See, e.g.*, *Frommert v. Becker*, 216 F. Supp. 3d 309, 216 (W.D.N.Y. 2016), *aff'd sub nom. Frommert v. Conkright*, 913 F.3d 101 (2d Cir. 2019) (awarding the federal prime rate in an action under ERISA and concluding that the rate "strikes an appropriate balance" of competing rates); *Masters v. Supp. Exec. Ret. Plan for Automated Packaging Sys., Inc.*, No. 07-1826, 2009 WL 1183377, at *2 (N.D. Ohio May 1, 2009) (finding the federal prime rate is "reasonable to achieve ERISA's remedial purpose.").  From August 2018 through September 2019, the rate remained mostly steady around 5.25%.  From October 2019 through October 2020, it remained mostly steady around 3.75 %.  From October 2019 through the present once again it has remained

---

[14] https://fred.stlouisfed.org/series/WGS1YR  (last visited July 7, 2021).

[15] *See Selected Interest Rates (Daily)- H.15*, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, https://www.federalreserve.gov/releases/h15/ (last visited July 7, 2021); *Historical Prime Rate 2013-2020*, JPMORGAN CHASE & CO., https://www.jpmorganchase.com/about/our-business/historical-prime-rate (last visited July 7, 2021).

mostly steady at 3.25%. Combining these rates to establish an approximate average, I exercise my discretion to award prejudgment interest at 3.85%.

### v. Attorneys' Fees

Finally, Plaintiff requests attorneys' fees and costs. Defendant argues this request is premature, and Plaintiff concedes that this is true. *See* Pl. Reply Brief at 29, ECF 34. Plaintiff is invited to fully brief her claim for attorneys' fees, and Defendant will have an opportunity to respond.

### V. Conclusion

Unum sees no evidence that Ms. Dwyer's condition has worsened to the point where she can no longer cope as well as she once could. But given the inherent challenges she faces as a double amputee and the nature of the problems presented by the intensification of her Meniere's disease, an objective view of the record amply supports her claim of disability. An appropriate Order follows.

/s/ Gerald Austin McHugh
United States District Judge
